653 So.2d 789 (1995)
Louella HARRIS, Plaintiff-Appellant,
v.
The LANGSTON COMPANY, INC., Defendant-Appellee.
No. 94-1266.
Court of Appeal of Louisiana, Third Circuit.
April 5, 1995.
Writ Denied June 23, 1995.
*791 John Henri Pucheu, Eunice, for Louella Harris.
Keitha Anne Leonard, Lafayette, for Langston Co., Inc.
Before COOKS, WOODARD, and PETERS, JJ.
PETERS, Judge.
This is a worker's compensation case. The plaintiff, Louella Harris, was injured during the course and scope of her employment with The Langston Company, Inc. The accident occurred on September 22, 1992, and the employer paid compensation benefits until January 5, 1993. Ms. Harris subsequently filed this action with the Office of Worker's *792 Compensation Administration seeking temporary total disability benefits or, alternatively, supplemental earnings benefits; medical benefits; and penalties and attorney fees. The hearing officer rendered judgment in favor of the employer, and Ms. Harris has appealed. The employer has answered the appeal seeking attorney fees, costs, and all other equitable relief for the defense of this appeal.

DISCUSSION OF RECORD
On September 22, 1992, Ms. Harris was employed by The Langston Company, Inc. (Langston) at its Continental Bag Plant facility in Crowley, Louisiana. She had been employed by Langston for approximately twenty-three years and was sewing sacks together on the day of the accident. As she was walking in the plant, she slipped in some water on the floor and, according to her, "fell flat" on her back. Initially, Langston's safety program director took her to Dr. Ray C. Boyer, the company's physician. Dr. Boyer, who practices in Lafayette, Louisiana, diagnosed the plaintiff's condition as a contusion of the left hip and advised her to return to work. Thereafter, according to Ms. Harris, she continued to suffer pain and sought relief at the emergency room of the American Legion Hospital of Crowley. However, the record does not contain any records from that medical provider.
Ms. Harris then sought treatment from Dr. Carl J. Richard, a Kaplan, Louisiana family practitioner, who was also Ms. Harris' family physician. Dr. Richard treated Ms. Harris on at least eighteen occasions from September 28, 1992, through May 9, 1994. Most of her complaints were related to back pain, and on at least three occasions, Dr. Richard found some spasm present. He initially diagnosed her condition as a contusion of the left hip with residual pain and a neck strain. However, his later assessments included chronic or protracted low back syndrome or pain or myofascial pain.
In October of 1992, Dr. Richard referred Ms. Harris to Dr. John R. Budden, an Abbeville, Louisiana orthopedic surgeon. Dr. Budden examined the plaintiff on three occasions: October 28, 1992, March 3, 1993, and March 31, 1993. On each occasion Ms. Harris complained of low back pain. After examination, Dr. Budden concluded that Ms. Harris had probably sustained a contusion to her lumbosacral spine region as well as a possible lumbosacral sprain. He found x-rays and a bone scan normal except for arthritic changes in the back and both knees. A complete lumbar CT scan was also negative.
On behalf of the defendant, a request was made for the plaintiff to see Dr. James R. Lafleur, a Lafayette, Louisiana orthopedic surgeon. Dr. Lafleur first saw Ms. Harris on December 15, 1992. After analysis of x-rays and examination of Ms. Harris, Dr. Lafleur concluded that she suffered from lumbar spondylosis with a superimposed mild myofascial strain but found no evidence of disc or nerve root problems. It was Dr. Lafleur's opinion that Ms. Harris suffered from preexisting arthritis which was aggravated by the fall. As of January 4, 1993, he felt Ms. Harris was capable of returning to her "pre-fall" duties and recommended that "she begin a trial of returning to work, to see how she would fare." This evaluation was the basis for the defendant terminating benefits on January 5, 1993.
Dr. Richard completed a job analysis evaluation on January 8, 1993, listing requirements which should be met before Ms. Harris could return to work. The requirements included wearing rubber-soled, laced shoes and a prescribed corset and taking breaks for ten minutes each hour.
After Ms. Harris' benefits were terminated, the following letter from Kay Mills, the defendant's plant manager at the time, was addressed to her and dated January 22, 1993:
It is our understanding that you have been released to return to work. It is also our understanding that in this release you are required to wear a corset and lace up rubber shoes. It is also our understanding that you received your corset on January 20, 1993. Your actual release to return to work was January 8, 1993 but because of unavailability of your corset at that time you were unable to report for work on January 11, 1993. Even though you failed to contact this office of your intention to *793 wait until you received your corset before returning, we took that into consideration.
If you fail to report to work on January 25, 1993 your employment will be terminated.
Ms. Harris did return to work on January 25, 1993, and worked an eight-hour day. She used her rubber-soled, laced shoes and her corset and was given permission to leave her work station and walk every hour. At the end of the day, she was in so much pain that she returned to Dr. Richard the next day. On examination, Dr. Richard found, among other things, spasm of the left lower to upper back and tenderness. He prescribed medication and, according to Ms. Harris, suggested bed rest for a week.
The defendant then placed Ms. Harris on leave-of-absence status from January 27, 1993, through February 2, 1993, which amounted to leave without pay. The plant manager addressed another letter to Ms. Harris dated January 27, 1993, which provided:
We received the note from Dr. Richard indicating your absence through February 2, 1993 and your return to work February 3, 1993. Under company policy I am authorized to approve this time off through February 2, 1993 as a leave of absence. We have prior notice from Dr. Richard and Dr. Lafleur that you are able to return to work from any injury received at work. Your work status from January 26, 1993 through February 2, 1993 is, therefore, considered a leave of absence. No additional leave time will be approved beyond February 2, 1993.
Therefore, you are expected to return to work at 7:00 a.m. on February 3, 1993. Failure to do so at that time will subject you to the provisions of the company's attendance and leave policy that includes [sic] disciplinary action up to and including termination of employment.
Although Ms. Harris was again examined by Dr. Richard on February 2, 1993, and the results of that examination revealed continued pain and tenderness as well as the existence of minimal spasm, she did return to work on February 3, 1993. However, she testified that after two days, she was unable to continue working and had to seek pain relief at the American Legion Hospital Emergency Room. According to Ms. Harris, even with the corset, shoes, and rest periods, she was not able to return to work because of the pain while sitting. After February 4, 1993, Ms. Harris was placed on layoff status by the defendant. Her employment was eventually terminated.
On February 9, 1993, Ms. Harris returned to Dr. Richard whose records noted the existence of tenderness in the lower back on the left side. After an examination on February 16, 1993, Dr. Richard decided to send Ms. Harris back to Dr. Budden for reevaluation. Ms. Harris saw Dr. Budden on March 3, 1993. Dr. Budden reported that he told Ms. Harris there was no objective reason for her not to be able to work and that he encouraged her to try to return to work on a trial basis for at least two weeks. Ms. Harris did not return to work. She saw Dr. Budden again on March 31, 1993, at which time he thought that Ms. Harris would best be treated by a physiatrist (a physician specializing in physical medicine and rehabilitation) and referred her to Dr. Thomas C. Laborde, a Lafayette, Louisiana, physiatrist.
Although the employer refused to pay for the physiatrist consult, Ms. Harris saw Dr. Laborde on six occasions from August 31, 1993, to April 4, 1994. Dr. Laborde noted spasm on at least three occasions. He felt Ms. Harris' low back and possibly even leg complaints were of a muscle or myofascial origin. Dr. Laborde recommended EMG and nerve conduction studies and thermography; none of these tests were performed. He noted that without the tests, he would have to indicate that her predominate pain was muscle or myofascial in origin. The tests were not performed because the employer refused to pay for them and the plaintiff claimed to be unable to do so.

OPINION

Miscalculation of Previously-Paid Weekly Benefits
At the time of the accident, the plaintiff was employed at $5.05 per hour and received production bonuses from time to time. After the accident, she was paid $186.16 in weekly *794 benefits through January 5, 1993. The plaintiff contends she was underpaid in weekly compensation benefits.
La.R.S. 23:1021(10)(a)(i) provides the method for calculation of the average weekly wage for a worker paid by the hour:
(10) "Wages" means average weekly wage at the time of the accident.
The average weekly wage shall be determined as follows:
(a) Hourly wages.
(i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater....
(Emphasis added).
In this case, the weekly compensation rate calculation cannot be calculated by reference to a single document. As acknowledged by Glen Johnson, the defendant's plant manager at time of trial, the company records are "a mess." The plaintiff's personnel file contains three documents concerning her 1992 work history. These are (1) an undated handwritten work sheet purporting to reflect the hours worked, bonuses earned, and actual wages paid on a day-to-day basis from August 23, 1992, to September 21, 1992; (2) a document entitled 1992 ABSENTEE CALENDAR; and (3) a document entitled 1992 PERSONAL TOTAL COMPENSATION SUMMARY.
These three documents, considered together, reveal that for the last four full weeks before the accident the plaintiff worked the following number of hours:

 Regular Hours Overtime Hours
 August 23 to August 29 36.50 1.00
 August 30 to September 5 40.00 21.00[1]
 September 6 to September 12 32.00[2] 11.25
 September 13 to September 19 40.00 10.25

Thus, over the four full weeks before the accident, the plaintiff averaged 37.13 hours of regular time per week and 10.88 hours of overtime. This constituted an average of $187.51 regular pay and $82.42 in overtime for a total average weekly wage of $269.93. Additionally, her bonuses should be taken into consideration in determining the appropriate wage rate. Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989). For the four weeks preceding the accident, the plaintiff received an average of $44.74 per week in bonuses. Therefore, the average weekly wage for workers' compensation purposes is $314.67. The appropriate weekly workers' compensation rate was therefore $209.78 instead of $186.16. Accordingly, we award back-due benefits of the difference between the amount paid and the amount owed, or $23.62 per week from date of accident to date of termination of benefits, together with interest from date due until paid.

Temporary Total Disability
The plaintiff argues on appeal that the hearing officer erred in denying her temporary total disability benefits after January 5, 1993.
Effective January 1, 1990, the Louisiana legislature amended La.R.S. 23:1221(1) by adding subparagraph (1)(c), which redefined temporary total disability. La.R.S. 23:1221(1)(c) now provides that an employee who seeks temporary total disability benefits must prove
by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless *795 of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
Thus, the existence of pain is not relevant to the question of temporary total disability benefits. Rosella v. DeDe's Wholesale Florist, 607 So.2d 1055 (La.App. 3 Cir.1992).
We first note that in a workers' compensation case, our review is subject to the manifest error or clearly wrong standard. Freeman v. Poulan/Weed Eater, 93-1530 (La. 1/14/94); 630 So.2d 733. The hearing officer found that the plaintiff had not established by clear and convincing evidence that she was temporarily totally disabled, and we find no manifest error in that decision. Since Ms. Harris' limitations are due to pain, we conclude that the plaintiff has not established by clear and convincing evidence that she is physically unable to engage in any employment or self-employment as required by La.R.S. 23:1221(1)(c).
Although we find no manifest error in the hearing officer's determination that Ms. Harris failed to prove entitlement to temporary total disability benefits, we do reverse the hearing officer's conclusion that January 5, 1993, was the proper date for termination of those benefits. As of that date, the employer had a return-to-work recommendation from its own choice of physician, Dr. Lafleur. When Dr. Richard approved the job analysis form on January 8, 1993, the analysis included a requirement that Ms. Harris wear a corset. That corset was not received by Ms. Harris until January 20, 1993. Therefore, we find that temporary total disability benefits should have been extended through January 20, 1993.

Supplemental Earnings Benefits
The plaintiff argues in the alternative that she is entitled to supplemental earnings benefits after her temporary total benefits were terminated. It is unclear whether the hearing officer implicitly denied this claim or failed to even consider it. Even assuming consideration of the claim, we find the hearing officer clearly wrong in this regard.
In order to recover supplemental earnings benefits, an employee must prove by a preponderance of the evidence that he is unable to earn wages equal to ninety percent or more of the wages he earned at the time of the injury. La.R.S. 23:1221(3); Smith v. Louisiana Dep't of Corrections, 93-1305 (La. 2/28/94); 633 So.2d 129. A "facts and circumstances" analysis is employed in which the court is mindful of the tenet that worker's compensation law is to be liberally construed in favor of coverage. Id. Once the employee meets his burden of proof, the burden then shifts to the employer to show that the employee is physically able to perform a certain job and that the job was offered to the employee or available to the employee within the employee's or employer's community or reasonable geographic region. La.R.S. 23:1221(3)(c)(i); Smith, supra. Additionally, La.R.S. 23:1221(3)(c)(ii) provides that the employee shall be deemed incapable of performing employment offered, tendered, or otherwise proven to be available to him if he establishes by clear and convincing evidence that, solely as a consequence of substantial pain, he cannot perform such employment.
At the time of trial, Ms. Harris was fifty-nine years old. According to Ms. Harris, she did not have to do any lifting in connection with her job as a sewer but the job required constant sitting. Ms. Harris initially returned to work on January 25, 1993, and she walked every hour. Still, she testified that the job requirements "messed her up" so much that she had to stop working. The following day, she returned to Dr. Richard with pain in her back and spasm. According to Ms. Harris, Dr. Richard recommended bed rest for one week and she followed his advice. Ms. Harris returned to work again on February 3 and 4 of 1993. However, after working these two days, she went to the emergency room and received two shots, at least one of which was for pain. Ms. Harris testified that even with the corset and shoes, she was not really able to work without pain because she was sitting down too long.
*796 She continued to have physical difficulties, and Dr. Laborde detected muscle spasm as late as November 29, 1993, January 11, 1994, and April 4, 1994. At trial, Ms. Harris testified that she could sit for thirty minutes or so without having any problems and that even though she sat in the hearing testifying for over thirty minutes, she was in pain and would "pay for this tonight."
In light of the nature of her job, the subjective complaints, objective symptoms, and actions taken after attempting to return to work, we find that Ms. Harris did prove that she was entitled to supplemental earnings benefits based on substantial pain. Since the defendant failed to prove any amount that Ms. Harris was able to earn after her injury, supplemental earnings benefits are calculated as a percentage of the difference between the wages earned at the time of the injury and zero. Carter v. New Orleans Fire Dep't, 94-0338 (La.App. 4 Cir. 11/17/94); 646 So.2d 455.

Payment for Dr. Laborde's Treatment
La.R.S. 23:1203(A) provides in part that the employer shall furnish all necessary medical treatment. Costs of medically necessary diagnostic tests recommended by the treating physician are recoverable when needed to determine the proper treatment for the patient, and the burden rests on the plaintiff to prove by a preponderance of the evidence that the required tests are necessary. Ratcliff v. Brandt Glass, Inc., 618 So.2d 500 (La.App. 4 Cir.1993). In Benoit v. PET, Inc., 93-1019 (La.App. 3 Cir. 4/6/94); 635 So.2d 620, writ denied, 94-1168 (La. 6/24/94); 640 So.2d 1352, we found that further medical treatment, as recommended by an orthopedic surgeon, was necessary considering that the claimant still suffered substantial pain.
As of his last consultation with Ms. Harris on March 31, 1993, Dr. Budden did not think that as an orthopedic surgeon there was a "great deal" he had to offer her at that point. Rather, Dr. Budden thought Ms. Harris would best be treated by a physiatrist and referred her to Dr. Laborde. Langston did not pay for treatment rendered by Dr. Laborde. This refusal was initially based on the recommendation of Dr. Lafleur and of a Dr. Edmund Landry, Jr. In January of 1994, Dr. G. Gregory Gidman, a Lafayette, Louisiana, orthopedic surgeon, examined Ms. Harris and also concluded she needed no further treatment other than symptomatic treatment at home in the form of soaks, rubdowns, a heating pad, and the proper sleeping position.
In conflict with these opinions is that of Dr. Laborde who testified that Ms. Harris has a continuing pain problem caused by her fall at work and that his treatment rendered and the tests recommended for her were medically reasonable and necessary. We note that Dr. Laborde treated Ms. Harris on more than one occasion and on at least three occasions found her to be suffering from muscle spasm, an objective finding. Ms. Harris continued with complaints of pain during the time of treatment and indicated at trial that she could only sit for thirty minutes or so without having any problems. We have found no reason to doubt the sincerity of her complaints. Therefore, despite opinions to the contrary by Drs. Landry, Gidman, and Lafleur, we find the treatment by Dr. Laborde necessary in light of the objective findings and continued complaints of pain.

Penalties and Attorney Fees
La.R.S. 23:1201(E) requires that whenever an employee's right to benefits has not been reasonably controverted, penalties shall be added. A workers' compensation claim is reasonably controverted if the employer had sufficient factual and medical information upon which to base a decision to terminate benefits. Thibodeaux v. Cajun Restaurant, 93-1090 (La.App. 3 Cir. 4/6/94); 635 So.2d 522 [quoting Bradley v. Justiss Oil Company, Inc., 618 So.2d 646, 651 (La.App. 2 Cir.1993)]. Additionally, La.R.S. 23:1201.2 provides that an employer or insurer who discontinues payment of claims due when the discontinuance is found to be arbitrary, capricious, or without probable cause shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims. Termination of benefits is not arbitrary and capricious when based on competent medical evidence. Miles v. F.D. *797 Shay Contractor, Inc., 626 So.2d 74 (La.App. 3 Cir.1993). It is incumbent upon the insurer to make reasonable efforts to ascertain the employee's exact medical condition at the time of termination of benefits. Id. Whether or not a termination of benefits is arbitrary, capricious, or without probable cause depends primarily on the facts known to the employer at the time of termination of benefits. Id.
Ms. Harris contends that the hearing officer erred in failing to award penalties and attorney fees. Specifically, she claims that Langston's failure to pay the proper amount of benefits due to miscalculation of her average weekly wage alone justifies imposition of penalties. Additionally, she contends Langston wrongfully terminated benefits on January 5, 1993.
As set forth above, Langston terminated benefits on January 5, 1993, on the basis of a statement on January 4, 1993, by the physician of its choice, Dr. Lafleur, that Ms. Harris could return to work. At this point, the record does not reflect a release to return to work from Dr. Richard, her treating physician, or from Dr. Budden, to whom Dr. Richard referred Ms. Harris. We do not find this information sufficient to terminate benefits or that Langston made a reasonable effort to determine Ms. Harris' exact medical condition at the time of termination. On January 8, 1993, Dr. Richard did sign a job analysis with certain requirements, including the use of a corset. However, Langston acknowledged in a letter to Ms. Harris that she did not receive her corset until January 20, 1993. Moreover, Ms. Harris returned to work on January 25, 1993, and returned to Dr. Richard the following day with spasm. On February 2, 1993, Ms. Harris returned to Dr. Richard with minimal spasm. Ms. Harris returned to work for the following two days, and according to her, went to the emergency room where she received two shots, at least one of which was for pain. It was not until March 3, 1993, that Dr. Budden reported that he told Ms. Harris that there was no objective reason for her not to be able to work and encouraged Ms. Harris to try to return to work on a trial basis for at least two weeks. Even so, Dr. Laborde found muscle spasm on three subsequent occasions. Under these circumstances, we find that Langston did not reasonably controvert Ms. Harris' right to benefits and that the termination was arbitrary, capricious and without probable cause.
Additionally, concerning the miscalculation of benefits, an insurer cannot escape penalties for nonpayment by urging its own poor clerical work. Brown v. Manville Forest Products Corp., 565 So.2d 496 (La. App. 2 Cir.), writ denied, 567 So.2d 1127 (La.1990). Also, the defendant acted in an arbitrary and capricious manner when it failed to correct its error after notification. Alexander v. B.F. Trappey & Sons, Inc., 93-549 (La.App. 3 Cir. 3/9/94); 635 So.2d 269.
Thus, we award Ms. Harris penalties as well as attorney fees in the amount of $5,000.00.

Answer to Appeal
Langston filed an answer asserting that the appeal filed by Ms. Harris was frivolous and that the judgment was correct in all respects. Langston seeks payment by Ms. Harris of attorney fees incurred in defense of this appeal and legal costs and any and all equitable relief. Having reversed the judgment to award back-due supplemental earnings benefits and the payment of Dr. Laborde's medical treatment as well as penalties and attorney fees, we deny the relief requested by Langston.

DISPOSITION
For the foregoing reasons, we reverse the judgment of the hearing officer and award $209.78 in weekly benefits for the period of September 22, 1992, through January 20, 1993, together with legal interest from the date each weekly benefit was due until paid in full, subject to a credit for those amounts already paid. We also award supplemental earnings benefits beginning January 20, 1993. We further order the payment of Dr. Laborde's treatment and assess statutory penalties and $5,000.00 in attorney fees at the trial and appellate levels. All costs of this appeal are assessed to the employer, The Langston Company, Inc.
*798 AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] The handwritten document does not show that Ms. Harris worked on August 31, 1992, while the ABSENTEE CALENDAR reflects that she did. The inaccuracies of the company records should be construed in favor of the plaintiff.
[2] This figure includes eight hours for the Labor Day holiday.