hSULLIVAN, Judge.
Martha Dupree filed this action against her former employer, Ace Home and Auto Stores (Ace), and its insurer, Louisiana *685 Workers’ Compensation Corporation (LWCC), seeking reinstatement of supplemental earnings benefits (SEB), recalculation of her average weekly wage, penalties, and attorney fees. Finding that LWCC had underpaid Dupree’s benefits, the hearing officer retroactively awarded the diffei’ence between what was paid and the correct amount, but rejected Dupree’s other claims. Dupree appeals.
Facts
Dupree was employed as the manager of Ace’s store in Morse, Louisiana. At trial, Dupree testified that, although she was the manager, she was usually the only employee in the store. Hence, her job duties included unloading incoming 12merchandise from trucks, stocking the shelves, moving furniture and appliances, and cleaning the store. She stated that on September 13, 1993, she injured her back while lifting an eighty-pound bag of salt. She continued to work for approximately one week, at which time she sought medical care.
On September 21, 1993, she saw Dr. Donald Marx, a chiropractor, with complaints of lower back pain radiating to the left hip and both legs. Dr. Marx noted that she walked with a guarded gait and had palpable muscle spasm over the left and right sacroiliac joint. He diagnosed her condition as a moderately severe muscle strain. His initial prognosis was good, but when she did not improve as expected he referred her to an orthopedic surgeon, Dr. Roland Miller.
Dr. Miller saw her first on October 15, 1993, noting that palpation over the sciatic notch produced tenderness and pain radiating to the right leg. He ordered an MRI, which revealed some desiccation and slight bulging, but no evidence of a herniated disc. After continued chiropractic therapy with Dr. Marx, including a TENS unit, Dr. Miller noted a fifty percent improvement by December 6, 1993. At the end of December, however, Dr. Marx reported that she was still unable to perform any meaningful duties at work or at home. When additional tests failed to reveal a surgical problem, Dr. Miller recommended a work hardening program.
By February of 1994, Dr. Miller approved a modified job position for Dupree, where she would work two hours a day in a sedentary capacity, such as ringing up sales for her former employer’, gradually progressing to light duty work. At the end of February, however, Dupree had to discontinue her TENS unit because of a rash, and by the end of March she was still only working two hours a day at very light work.
In April, Dupree began working four hours of light duty work a day, but was again reporting severe pain in her back that radiated through her left leg. After a myelogram and CT scan reported normal results, Dr. Miller recommended on April 13, |¾1994 that she continue working four hours a day for two more months, at which time she “probably would be able to return to her full work duties for eight hours a day.” Dr. Miller requested feedback at the end of the two-month period to determine how she performed at the increased level of four hours a day; his notes do not reflect that she was discharged at this time. However, on May 20, 1994, before the end of that two-month period and without examining her again, Dr. Miller reported that Dupree was able to return to her prior work duties without restrictions. Her SEB was discontinued on the basis of this report.
At LWCC’s request, Dupree was also seen by another orthopedic surgeon, Dr. Gregory Gidman, on two occasions. On December 10, 1993, Dr. Gidman recommended that she continue therapy three times a week, while returning to work in a supervisory capacity, with no lifting over five to ten pounds and no repetitive bending. He anticipated that she could return to normal activities within a month. On March 4,1994, however, he again imposed similar restrictions, stating, “I have no objections to this lady returning to light duty activity at work as long as it is a supervisory type nature. She should avoid any bending or any lifting.” He encouraged her to return to all normal activities as tolerated, including returning to work with limitations, and he suggested a home strengthening program for the abdominal and lumbar' musculature. He had no objection to the progressive strengthening program suggested by Dr. Miller.
*686 After her benefits were discontinued and after Dr. Miller refused to schedule a return appointment for her, Dupree was seen by Dr. Michel Heard on June 20, 1994. Dr. Heard agreed that she did not have a surgical problem, but he suspected some nerve root irritation caused by intermittent muscle spasm. Tq identify the source of her radicular pain, Dr. Heard recommended a consultation with a neurologist for an EMG and nerve conduction studies. Because Dupree could not tolerate oral pain 14medications, he recommended cortisone injections to relieve any inflammation in the back, followed by therapy. He considered her capable of performing only light to sedentary activities.
Floyd Harrington, the owner of the store where Dupree worked, testified that before the accident Dupree worked fifty-two hours a week, earning $4.40 an hour, overtime after forty hours, and commissions. Harrington testified that after Dupree returned to light duty he observed that she could not stand for very long periods of time and that she walked as though she were in pain. She sat down most of the time, working only at the cash register and counter. When asked if he believed if she could do any heavy lifting, he replied, “No way.” After Dupree returned to light duty, Harrington closed his store in Morse, but he testified that he offered her a job about six miles from Morse at his store in Gueydan. He did not state whether this job was for full duty or light duty work.
Kevin Bates, an adjuster, testified that LWCC initially paid Dupree temporary total disability benefits of $180.86 per week, but when Dupree informed them that she also received commissions, her benefits were reduced to $134.96. They'were later increased to $184.19 after the adjuster was informed of a legal decision regarding the computation of hourly wages and commissions. (The hearing would later determine that Dupree should have been paid $197.75 weekly.)
Bates testified that LWCC placed Dupree under surveillance several times between November of 1993 and March of 1994. He admitted on cross-examination that all surveillance reports indicated that Dupree exhibited restricted movements, walked cautiously, and appeared in obvious pain and discomfort. Bates also testified that a final investigative report issued in September of 1994, four months after Dupree’s benefits were terminated, indicated that Dupree did not leave her residence in the three days that she was under surveillance.
| sDupree testified that she has an eighth grade education. Her prior jobs included working in the pastry department of a food mart, where she had to lift large quantities of baking supplies, and working as a bus driver for handicapped children. She testified that when she first returned to light duty, the insurance company wanted her to work at the Gueydan store, but that store was larger, had more customers, and required more walking. On light duty in the Morse store, she did only office work and cash register sales. There, she could alternate sitting and standing as her condition required. She denied that Harrington told her of an opening at the Gueydan store on her last day of work. After the Morse store closed, she applied for a cashier’s job at a drugstore in Crowley and a food mart in Gueydan, but was not hired. In addition to seeing Dr. Heard, after her benefits were terminated, Dupree sought treatment at Moss Regional Hospital, but she did not introduce any hospital records. She claimed that the hospital recommended oral pain medications, which she cannot tolerate.
The hearing officer rejected Dupree’s claims for supplemental earnings benefits, penalties, and attorney’s fees, finding that she did not prove disability “as a result of substantial pain which prevents her from engaging in any employment.” The hearing-officer also concluded that Dr. Miller was justified in not scheduling a return appointment for Dupree before May 20, 1994 because her condition did not change after April 13,1994. The hearing officer did agree that Dupree was under paid benefits, but found that this underpayment was not the result of arbitrary and capricious conduct.
Supplemental Earnings Benefits
Dupree first argues that the healing officer used an incorrect legal analysis in denying her claim for SEB. We agree. The hearing officer wrote the following in her reasons for judgment:
*687 |GThe court believes the issue presented is whether Ms. Dupree is entitled to benefits as a result of substantial pain ivkich prevents her from engaging in any employment. The burden is on Ms. Dupree to establish such entitlement by clear and convincing evidence, and this she has failed to do. Dr. Miller and Dr. Heard both felt she was capable of some work activity, though to differing extents, and the substantial pain doctrine is not available under those circumstances. See Comeaux v. Sam Broussard Trucking, 657 So.2d 449, 94-1631 (La.App. 3rd Cir.1995).
(Emphasis added.)
A claim for SEB is governed by a three step analysis, as explained in Harris v. Langston Co., Inc., 94-1266, p. 9 (La.App. 3 Cir. 4/5/95); 653 So.2d 789, 795, writ denied, 95-1178 (La.6/23/95); 656 So.2d 1020:
In oi’der to recover supplemental earnings benefits, an employee must prove by a preponderance of the evidence that he is unable to earn wages equal to ninety percent or more of the wages he earned at the time of the injury. La.R.S. 23:1221(3); Smith v. Louisiana Dep’t of Corrections, 93-1305 (La.2/28/94); 633 So.2d 129. A “facts and circumstances” analysis is employed in which the court is mindful of the tenet that worker’s compensation law is to be liberally construed in favor of coverage. Id. Once the employee meets his burden of proof, the burden then shifts to the employer to show that the employee is physically able to perform a certain job and that the job was offered to the employee or available to the employee within the employee’s or employer’s community or reasonable geographic region. La.R.S. 23:1221(3)(c)(i); Smith, supra. Additionally, La.R.S. 23:1221(3)(e)(ii) provides that, the employee shall be deemed incapable of performing employment offered, tendered, or othenvise proven to be available to him if he establishes by clear and convincing evidence that, solely as a consequence of substantial pain, he cannot perform such employment.
(Emphasis added.)
Thus, before reaching the question of substantial pain, the hearing officer should have concluded, first, that Dupree proved by a preponderance of the evidence that she is unable to earn ninety percent or more of her pre-accident wages and, second, that defendants proved that Dupree is physically able to perform a certain job that was offered or is otherwise available in a certain geographic region. Only then would Dupree be required to prove by clear and convincing evidence that she cannot perform \iS%ich offered or available employment (not any employment) solely as a consequence of substantial pain.
We find that the hearing officer did not follow this analysis. At first, the hearing-officer appears to accept Dr. Miller’s release of Dupree to full duty with no restrictions. At that point, the analysis should have stopped because Dupree would not have shown a loss in earning capacity. However, the hearing officer continued, referring to the “substantial pain doctrine” in the context of any employment, rather than in reference to a certain job that defendants have shown to be offered or available to the claimant. The reasons in their entirety convince us that the hearing officer required Dupree to make an initial showing by clear and convincing evidence that she is unable to perform any employment solely because of substantial pain. As discussed above, this is not the threshold requirement for an SEB claim.
A hearing officer’s findings of fact are not to be set aside by an appellate court unless those findings are manifestly erroneous. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94); 630 So.2d 706. However, “[t]he manifest error rule does not insulate a hearing officer’s findings when these are based on an incorrect analysis of the statute.” Mitchell v. AT & T, 27,290, p. 9 (La.App. 2 Cir. 8/28/95); 660 So.2d 204, 210, writ denied, 95-2474 (La.12/15/95); 664 So.2d 456. Our opinion, therefore, is based upon a de novo review of the record.
“In determining whether the claimant is entitled to SEB, the court must weigh all evidence, medical and lay, to determine if the claimant has met his burden of proof.” Courville v. Omni Drilling, 96-174, p. 3 (La.App. 3 Cir. 7/10/96); 676 So.2d 861, 863, writ denied, 96-2073 (La.11/8/96); 683 So.2d 276.
*688 In the instant ease, Dupree was working on light duty status only four hours a day when her benefits were terminated. Both medical and lay testimony corroborates Du-pree’s claim that she could not return to full duty at that time. Her employer |stestified that she appeared to be in pain when she returned to light duty status and that in his opinion she could not return to heavy lifting. Dr. Gidman examined Dupree on March 7, 1994, two months before her benefits were terminated. Although Dr. Gidman could find no orthopedic explanation for her complaints, he did not consider her capable of full duty. Instead, he had no objections to her returning to light duty work, as long as it was in a supervisory capacity, and he recommended an abdominal and lumbar home strengthening program. Dr. Heard examined her on June 20, 1994, one month after benefits were terminated. He, too, considered her capable of only light to sedentary activities.
Dr. Miller did release Dupree to full duty on May 20, 1994. However, it is undisputed that Dr. Miller did not examine her on that date. Rather, that report was generated when Dupree’s counsel inquired as to why Dr. Miller refused to schedule a follow-up áppointment for Dupree, after she had repeatedly requested one. On her last visit, on April 13, 1994, Dr. Miller predicted that Du-pree would 'be able to return to full duty after two months of light duty at four hours a day. Although Dr. Miller believed she had reached maximum medical improvement, he did not discharge her at that time. His records indicate that he wanted feedback after two months of light duty before releasing her to full duty. Yet, he released her to full duty before the end of this two month period and without examining her again. In his deposition, Dr. Miller testified that his May 20, 1994 report was based upon an anticipation of normal healing, considering her negative test results. However, he also admitted that he was not aware of her medical condition after April 13,1994.
In Despain v. Guichard Drilling Co., 93-933 (La.App. 3 Cir. 3/2/94); 634 So.2d 1240, the claimant’s treating physician stated in a deposition that he intended to release his patient in one month with an impairment rating but with no permanent activity restrictions. However, the doctor never released the patient because the insurer refused |<)to pay for any further office visits after the patient missed his next appointment. In that case, we held that it was error for the insurer to terminate the claimant’s benefits without a discharge, particularly when the claimant’s medical condition had never progressed in accordance with the doctor’s predictions.
Similarly, in the instant case, Dupree’s condition did not progress as expected. Drs. Marx and Miller initially expected a quick recovery. Dr. Miller noted a fifty percent improvement when Dupree began using her TENS unit; however, her condition worsened upon its removal. Dr. Gidman, too, expected a full return to work within a month of his report of December 10, 1993. However, when he saw her again on March 4, 1994, after she discontinued the TENS unit, he still did not recommend a full release.
With this medical history, and the lay testimony corroborating Dupree’s complaints, we find that Dupree met the threshold burden of proving her inability to earn ninety percent or more of her pre-accident wages. Dr. Miller’s final report, which was not based on an examination of the patient, cannot be considered in isolation from the other medical and lay testimony. Courville, 676 So.2d 861.
At that point, the burden shifted to defendants to prove that Dupree was physically capable of performing employment which was offered or available. La.R.S. 23:1221(3)(c)(i); Tassin v. Cigna Ins. Co., 583 So.2d 1222 (La.App. 3 Cir.1991). Medical and other records indicate that LWCC hired a vocational rehabilitation counselor to locate employment for Dupree. However, LWCC did not call this counselor or introduce the results of his job search. Instead, defendants sought to meet this burden through Harrington’s testimony that he offered Du-pree a job at his Gueydan store.
As discussed above, Dupree disputed that such an offer was ever made. However, even accepting Harrington’s testimony, we find that it falls short of proving 110that Du-pree was physically able to perform the job. *689 Harrington never clarified whether the position was light duty or medium/heavy duty, full time or part time. At first, Harrington testified that he knew that Dupree had been fully released by her doctors; later in his testimony, he indicated that he did not believe Dupree could perform any heavy lifting. As Dupree explained, the Gueydan store was larger, with more customers, and required more physical activity than the Morse store. At the Morse store, Dupree could sit or stand, as needed while she worked reduced hours. The record is unclear whether the accommodations in Morse would have been available in Gueydan.
We need not reach the issue of whether Dupree is prevented from working because of substantial pain under La.R.S. 23:1221(3)(e)(ii), as defendants did not meet the burden imposed by La.R.S. 23:1221(3)(e)(i). Accordingly, we order that Dupree’s SEB be reinstated at the rate computed by the hearing officer.
Penalties and Attorney Fees
Dupree next argues that she is entitled to penalties and attorney fees under former La. R.S. 23:1201(E) and 1201.2 for LWCC’s termination of her SEB and its refusal to pay the correct amount of benefits.
LWCC’s adjuster testified that Du-pree’s benefits were terminated upon receipt of Dr. Miller’s May 20, 1994 report. In that report, Dr. Miller states that Dupree is discharged because of her negative physical exam and tests and because she is able to return to all of her prior work activities. The adjuster also testified, however, that LWCC was aware that Dr. Miller did not examine Dupree on that date.
In Dr. Miller’s earlier report, he recommended that Dupree perform four hours of work a day for two months. He stated, “I would anticipate that at the end of the two month time of working four hours a day, that she probably would be able to return to her full work duties for eight hours a day.”
| xlIt is well settled that an insurer must make reasonable efforts to ascertain the employee’s exact medical condition at the' time benefits are terminated. Redman v. Labor Express, 96-228 (La.App. 3 Cir. 10/9/96); — So.2d —, Harris, 653 So.2d 789. In Patton v. Silvey Cos., 395 So.2d 722, 725 (La.1981), the supreme court offered the following warning:
There is nowhere in the jurisprudence authority for an employer to rely on a treating physician’s prognosis, by its very nature an equivocal statement of the claimant’s future condition. The unreliability of prognostication should be especially evident where, as in the instant case, the report is rendered so far in advance [six weeks] of the expected date of recovery.
In Despain, 634 So.2d 1240, we penalized the insurer for terminating benefits without a release from the claimant’s physician, even though the physician predicted the claimant would have no work restrictions in one month. Similarly, in Redman, we found penalties were warranted when the insurer relied upon a doctor’s prognosis of a six week recovery period.
The instant case is somewhat distinguishable in that the physicians in Despain and Redman never released their patients before benefits were terminated. Here, Dr. Miller did issue a report releasing Dupree, but he reached his conclusion without re-evaluating her condition. We find that penalties and attorney fees are warranted in this case, when we consider that the adjuster knew Dr. Miller’s final report was not based upon an examination of the claimant. In addition to statutory penalties, we fix reasonable attorney fees at $5,000.00 for the prosecution of this claim at trial and on appeal.
Dupree also seeks to penalize LWCC for its failure to pay the correct amount of benefits. Her benefits were calculated on three separate occasions, with the hearing-officer agreeing that none of the prior calculations was correct.
| rein Stegall v. J & J Exterminating, 94-1279, p. 6 (La.App. 3 Cir. 3/1/95); 651 So.2d 400, 403, we stated:
Generally, an insurer will not be penalized for a simple miscalculation of benefits; however, penalties and attorney’s fees have been imposed where the insurer gathers incomplete data in preparing the claim *690 or makes no attempt to correct an error that was pointed out to it. Barton v. Wausau Insurance Co., 545 So.2d 1248 (La.App. 2 Cir.1989). An insurer may not proceed with an attitude of indifference to the injured worker’s situation. Mallet v. Louisiana Nursing Homes, Inc., 459 So.2d 178 (La.App. 3 Cir.1984), writs denied 463 So.2d 604, 605 (La.1985).
We find that LWCC acted with such indifference when it reduced Dupree’s benefits as a “straight commission” employee in November of 1993. A simple examination of her payroll records should have revealed that she was paid both hourly wages and commissions. See Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989). The insurer is accountable for its failure to gather this information. We, therefore, award penalties on the difference between benefits paid and owed and an additional attorney fee of $500.00 for prosecution of this claim.
Further Medical Treatment
Dupree next argues that the hearing officer erred in refusing to order defendants to pay for continued medical treatment recommended by Dr. Michel Heard. Defendants respond that they are not responsible for Dr. Heard’s charges because Dupree switched treating physicians in the same specialty without their consent, in violation of La.R.S. 23:1121 (B).
That statute provides:
The employee shall have the right to select one treating physician in any field or specialty. After his initial choice the employee shall obtain prior consent from the employer or his worker’s compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
La.R.S. 23:1121(B), when read with La. R.S. 23:1203(A), has been interpreted to allow the employee to recover medical expenses for treatment by a physician | i3incurred without seeking approval from the employer, even though the employee had been examined by another physician in the same field. The only requirement is that the treatment be both reasonable and necessary.
“The employer is then bound to provide for those expenses with the exception of the initial unauthorized visit.” Lemoine v. Hessmer Nursing Home, 94-836, p. 18 (La.App. 3 Cir. 3/1/95), 651 So.2d 444, 455.
Dr. Heard had three recommendations. He suggested a repeat MRI and CT scan, a consultation with a neurologist, and anti-inflammatory injections. As Dupree cannot tolerate oral pain medications (records indicate that none had been prescribed) and as Dr. Miller concurred in the removal of her TENS unit, we find that the consultation with the neurologist and the anti-inflammatory medications are reasonable and necessary treatment to relieve her pain. Defendants are, therefore, responsible for the cost of this treatment, with the exception of the initial unauthorized visit. We cannot agree that a repeat MRI and CT scan is necessary, in that all four physicians are in complete agreement that Dupree does not have a surgical problem.
Court Costs
Dupree asks that we reverse the hearing officer’s assessment of court costs equally between the parties. In view of our decision herein, we agree that all charges taxed as trial costs and all costs of this appeal should be assessed against defendants.
Decree
For the above reasons, the judgment of the Office of Workers’ Compensation is reversed in part, and claimant, Martha Dupree, is awarded reinstatement of supplemental earnings benefits, from June 1, 1994, penalties in accordance with former La.R.S. 23:1201(E), and attorney fees in the amount of $5,500.00, with legal interest on these three awards from date of this judgment. We further find defendants responsible for Dupree’s treatment with Dr. Heard, as outlined above, excepting the | ^initial visit, and that defendants are responsible for costs of trial and appeal. In all other respects, the judgment of the Office of Workers’ Compensation is affirmed.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.